**2018 UT App 157**

## THE UTAH COURT OF APPEALS

IN THE INTEREST OF B.T.B. AND B.Z.B.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

V.T.B.,
Appellant,
*v.*
J.P.B.,
Appellee.

Opinion
No. 20170906-CA
Filed August 23, 2018

Fifth District Juvenile Court, St. George Department
The Honorable Michael F. Leavitt
No. 1142575

J. Robert Latham, Attorney for Appellant

LaMar J. Winward, Attorney for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES KATE A. TOOMEY and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1     V.T.B. (Father) appeals the juvenile court's order terminating his parental rights to his children, B.T.B. and B.Z.B. He contends that termination was not "strictly necessary" in this case, for various reasons. Father's arguments compel us to directly analyze the meaning of the phrase "strictly necessary," as used in Utah Code section 78A-6-507(1), and require us to examine how that relatively new statutory admonition fits with the historical two-part test we have long applied in termination of parental rights cases.

¶2     In order to comprehensively answer these questions, we find it necessary to re-examine and disavow some of our case law in this area. Ultimately, we conclude that courts should analyze the "strictly necessary" language as part of the "best interest" element of our historical test, but we emphasize that—partly because of the addition of the "strictly necessary" aspect of the analysis—the "best interest" inquiry should be applied in a more thorough and independent manner than some of our cases might suggest. Because we clarify and partially reformulate the test for termination of parental rights, we remand this case to the juvenile court for reconsideration in light of this opinion.


BACKGROUND

¶3     Father and J.P.B. (Mother) married in 2010 and divorced in 2013. B.T.B. and B.Z.B. (the Children) are their children. After the divorce, the Children remained in Mother's custody; they have never been in the custody of the State. Beginning in 2012, Father has periodically been incarcerated for a variety of offenses, largely resulting from drug use. Since the divorce, Father has had only occasional contact with the Children, visiting them a total of fourteen times and sending them infrequent letters and Facebook messages. Father has never paid child support, despite being ordered to do so.

¶4     In March 2017, Mother filed a petition with the juvenile court to terminate Father's parental rights. As discussed in greater detail below, Utah courts have historically applied a two-part test when considering whether to terminate parental rights: (1) whether statutory grounds for termination are present, and (2) whether termination of the parent's rights is in the best interest of the affected child. *See In re T.E.*, 2011 UT 51, ¶¶ 17–18, 266 P.3d 739. At the termination of parental rights hearing, Mother argued that statutory grounds for termination existed

because Father had abandoned and neglected the Children, and had made only "token efforts" to communicate with them. Mother argued that it would be in the Children's best interests for Father's parental rights to be terminated because it "ripped [the Children's] hearts out every time" Father went to prison and dropped out of contact, causing significant instability in their lives. Mother also referenced some of our cases that indicate that, when statutory grounds for termination are present, it follows "almost automatically" that it will be in the child's best interest to terminate the parent's rights. Although Father did not contest the existence of statutory grounds for termination, he argued that it was not in the Children's best interests to terminate his rights because he "loves [the Children], loves to be with [the Children], cares about them, [and] wants to protect them," and because the Children could benefit from having a "strong relationship" with him.

¶5    Father also advanced a separate argument, pointing out that the Utah Legislature modified the relevant statutory language to state that courts may terminate parental rights only if they find termination to be "strictly necessary." *See* Utah Code Ann. § 78A-6-507(1) (LexisNexis 2012). Father argued that this statutory modification required the juvenile court to find that termination was "strictly necessary" before terminating his parental rights, and argued that this requirement could not be met unless the termination was required to "free the children for adoption." Thus, Father asserted that, because Mother's petition did not anticipate an adoption or any other change in the Children's living situation, it was not "strictly necessary" to terminate his rights.

¶6    After taking the matter under advisement, the juvenile court issued an order terminating Father's rights. The court found that several statutory grounds for termination were present. The court further determined that termination of Father's parental rights would be in the Children's best interests,

because "[t]he Children have not had the opportunity to establish any kind of appropriate parent-child relationship" with Father and because reintroduction of Father into the Children's lives would likely require "reintroduction therapy," which the court determined would "not provide the Children the kind of permanency that they need and deserve." The court "separately" analyzed whether termination of Father's rights was "strictly necessary," and rejected Father's argument that, without a pending adoption, termination could never be "strictly necessary." The court found it "strictly necessary" to terminate Father's rights, because Father's "inconsistent parent time . . . will continue to damage the Children unless they are given a more permanent living situation," and determined that "such permanency is only available to the Children by terminating" Father's rights.

ISSUES AND STANDARDS OF REVIEW

¶7     Father appeals the juvenile court's order terminating his rights. The crux of the appeal is whether the juvenile court correctly applied the "strictly necessary" language to the historical test for termination of parental rights. We review a trial court's interpretation of a statute for correctness. *Holste v. State*, 2018 UT App 67, ¶ 5.

¶8     The ultimate decision about whether to terminate a parent's rights "presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. In such situations, we review a trial court's "findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re G.B.*, 2002 UT App 270, ¶ 11, 53 P.3d 963 (quotation simplified). Indeed, due to the "factually intense nature" of the analysis, a trial court's final decision regarding termination of parental rights "should be afforded a high degree of deference." *In re B.R.*, 2007 UT 82, ¶ 12.

Accordingly, to overturn a trial court's decision in a termination case, "the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *Id.* (quotation simplified).

ANALYSIS

I

¶9 A parent's right to raise his or her child is one of the most precious rights any person enjoys, and is among the fundamental rights clearly protected by our federal and state constitutions. *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). Indeed, the United States Supreme Court has stated that "the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests" the court recognizes. *Id.* at 65; *see also id.* at 66 (citing cases, and stating that "[i]n light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

¶10 For its part, our supreme court has been no less emphatic in its description of the constitutional importance of the rights of parents, declaring that "[a] parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child," that "[i]t is fundamental to our jurisprudence that the custody, care, and nurture of the child reside first in the parents," and that "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982) (quotation simplified).

¶11 Our legislature has expressed a similar view, making legislative findings that "[u]nder both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's children." Utah Code Ann. § 62A-4a-201(1)(a) (LexisNexis Supp. 2017); *see also id.* § 78A-6-503(1) (making identical findings). This fundamental liberty interest "does not cease to exist simply because a parent may fail to be a model parent." Utah Code Ann. § 62A-4a-201(1)(b). Indeed, "[a]t all times, a parent retains a vital interest in preventing the irretrievable destruction of family life." *Id.*

¶12 Given the constitutional dimension of parental rights, the legal standards for terminating them are strict. Our supreme court has so stated on several occasions, emphasizing that "[t]he termination of parental rights is a drastic measure that should be resorted to only in extreme cases, when it is clear that the home is unable or unwilling to correct the evils that exist." *In re A.H.*, 716 P.2d 284, 287 (Utah 1986); *see also In re Castillo*, 632 P.2d 855, 856 (Utah 1981) (stating that "it is not our view . . . that the termination of parental rights can be decreed without giving serious consideration to the prior and fundamental right of a parent to rear his [or her] child"); *In re Baby Girl Marie*, 561 P.2d 1046, 1048 (Utah 1977) (stating that "[t]he permanent termination of all parental rights is one of the most drastic actions the state can take").

¶13 Under the test established by our legislature and our supreme court, parental rights can be terminated only if both elements of a two-part test are satisfied. First, a trial court must find that one or more of the statutory grounds for termination are present. *See In re A.C.M.*, 2009 UT 30, ¶ 23, 221 P.3d 185. In the current statute, these statutory grounds are listed in Utah Code section 78A-6-507, and include things such as abuse, neglect, and abandonment. *See* Utah Code Ann. § 78A-6-507(1). Second, a trial court must find that "termination of the parent's

rights is in the best interests of the child." *A.C.M.*, 2009 UT 30, ¶ 23; *see also In re T.E.*, 2011 UT 51, ¶ 18; Utah Code Ann. § 78A-6-503(12) (stating that, if it finds statutory grounds for termination, "the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered"). The trial court must make both of these findings not merely by a preponderance of the evidence, but by "clear and convincing evidence," *see In re T.E.*, 2011 UT 51, ¶ 17, and the burden of proof rests with the petitioner, *see* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012).

¶14    Each part of this test is important. Indeed, our supreme court once rejected, as unconstitutional, legislative efforts to remove the first part of the test—the one that requires the presence of parental unfitness (or similar ground) before termination occurs. *See In re J.P.*, 648 P.2d at 1374–75. At issue in that case was a 1980 statute that eliminated all statutory grounds for termination, and reduced the test simply to whether "such termination will be in the child's best interest." *Id.* at 1368. Our supreme court held that statute unconstitutional, stating that "termination of parental rights solely on the basis of the child's best interest and without any finding of parental unfitness, abandonment, or substantial neglect, violates the parent's [constitutional] liberty rights." *Id.* at 1375. The court rejected the State's argument, in defense of the statute, that "any distinction (between the best interest and unfitness standards) is a mere matter of semantics." *Id.* at 1368 (quotation simplified). The court emphasized that the test for termination of parental rights properly contains both elements, explaining that "[t]he best interest of the child has always been a paramount or 'polar star' principle in cases involving termination of parental rights," and is "a vital ingredient in a determination that has at least two elements," but that "no court is warranted in applying the 'polar

star principle'" until after evidence of unfitness is present. *Id.* (quotation simplified).[1]

¶15   Indeed, our supreme court has never endorsed any watering-down of the two-part test for termination of parental rights. That court has always articulated a test comprised of two distinct, rigorous parts, each of which must be satisfied before parental rights can be terminated. *See In re T.E.*, 2011 UT 51, ¶¶ 17–18; *In re A.C.M.*, 2009 UT 30, ¶ 23; *see also In re J.P.*, 648 P.2d at 1368 (rejecting the argument that there was only minimal distinction between the two elements of the test). The court must find that one of the statutory grounds (e.g., abuse, neglect, abandonment) is present, and that termination of parental rights is in the best interest of the child.

¶16   And, at least not in recent years (the 1980 episode notwithstanding), our legislature has not attempted to weaken the two-part test either. The statutory scheme currently requires the presence of one or more grounds for termination, such as abuse, neglect, or abandonment, *see* Utah Code Ann. § 78A-6-507(1)(a)–(i), and, in addition, twice instructs courts that, even where statutory grounds are present, they must still "consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered," *see id.* § 78A-6-503(12); *see also id.* § 78A-6-506(3) (stating that, after the petitioner has established grounds

---

1. On another occasion, our supreme court suggested—although it stopped short of deciding—that the second ("best interest") part of the test might also be "constitutionally required." *See In re R.B.F.S.*, 2011 UT 46, ¶ 7 n.6, 258 P.3d 583. There, the court "note[d] that some courts have suggested that a best interests analysis may be constitutionally required before a child's familial relationships can be terminated." *Id.* (citing cases and authorities).

for termination by clear and convincing evidence, "the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered").

¶17    Moreover, in 2012 the legislature inserted new language into section 507, stating that a court may terminate parental rights only "if the court finds [termination] strictly necessary." *See* Utah Code Ann. § 78A-6-507(1). We must here decide what that additional language means and how it fits with the historical two-part test, but it is obvious from the language used ("strictly necessary") that the legislature was not attempting to make it easier for courts to terminate parental rights.

¶18    Thus, every indication from our legislature and our supreme court demonstrates that our law has had, and continues to have, a rigorous test that does not permit termination of a parent's fundamental constitutional right to parent his or her child unless both (a) statutory grounds for termination are present, and (b) termination is in the best interest of the child.

II

¶19    Since the 2012 statutory amendment, we have mentioned the "strictly necessary" language on a number of occasions,[2] but we have not provided definitive guidance on whether, and how, the "strictly necessary" statutory addition affected the historical two-part test for termination of parental rights. Given the questions raised in Father's appeal, we must address these issues. In order to do so comprehensively, we must examine not

---

2. *See, e.g., In re K.W.*, 2018 UT App 44, ¶¶ 29–31, 420 P.3d 82; *In re B.A.*, 2017 UT App 202, ¶ 21, 407 P.3d 1053; *In re P.B.*, 2017 UT App 82, ¶ 6, 397 P.3d 850; *In re D.L.*, 2014 UT App 297, ¶¶ 3, 6, 342 P.3d 291; *In re C.J.*, 2013 UT App 284, ¶ 8, 317 P.3d 475.

only the statutory language in question ("strictly necessary"), but also some of our case law that is inconsistent with the statutory language.

¶20    In contrast to our supreme court and our legislature, this court has developed a line of cases that has gradually but meaningfully diluted the second ("best interest") element of the two-part test. This court stated as far back as 1988 that satisfaction of

> [t]he second prong of the objective abandonment test, whether the parental disregard led to the destruction of the parent-child relationship, satisfies the need separately to consider the best interest of the child. If the parent-child relationship has been destroyed by the parent's conduct, or lack of conduct, it is *usually* in the best interest of the child to terminate that relationship . . . .

*In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct. App. 1988) (emphasis added). Although the applicability of that statement could be interpreted to be limited to cases in which a parent's rights were terminated as the result of abandonment, over time, in some of our cases,[3] we have extended this concept to other types of termination cases, and categorically declared that "where grounds for termination are established, the conclusion that termination will be in a child's best interest follows *almost automatically*." *See, e.g., In re G.J.C.*, 2016 UT App 147, ¶ 25, 379

---

3. As we discuss later in this opinion, *see infra* ¶ 42 & n.10, this court has been inconsistent in this area. Indeed, on one occasion, we specifically rejected the argument that a court should presume termination to be in the best interest of a child, if statutory grounds for termination are present. *See In re R.A.J.*, 1999 UT App 329, ¶¶ 21–22, 991 P.2d 1118.

P.3d 58 (emphasis added) (quotation simplified); *see id.* (applying the concept in an unfitness case, and also stating that "[i]t is an unusual case where grounds for termination are found but termination is held not to be in the child's best interest").[4]

¶21    In these cases, we have emphasized that exceptions to this rule are rare. Indeed, we have recognized "unusual" situations in only two cases: (1) where a parent sought relinquishment of his or her own rights in an effort to avoid child support obligations, and in such cases we acknowledged that it may be in the child's best interest from a financial standpoint to keep the parent on the hook, *see In re B.M.S.*, 2003 UT App 51, ¶¶ 19–20, 65 P.3d 639; and (2) where the child in question was old enough to express a meaningful preference and objected to the termination, *see In re D.R.A.*, 2011 UT App 397, ¶¶ 5, 19, 266 P.3d 844. Although our case law certainly leaves the door open for the recognition of other exceptional situations, we have not yet recognized any, and we have repeatedly emphasized that, once a court finds a statutory ground for termination, it will almost always follow from that conclusion that it is in the child's best interest to terminate parental rights.

---

4. Although Mother cited the "almost automatically" cases to the juvenile court, in her memoranda as well as at the hearing, no party cited or discussed those cases in their initial briefs filed on appeal. After oral argument, however, we invited supplemental briefing on various questions, including whether "this appeal can, in whole or in part, be resolved by resort to" our "almost automatically" line of cases, and whether "we ought to consider overruling or disavowing" that line of cases. The parties each filed supplemental briefs, with Father arguing that we should disavow those cases, and Mother and the guardian ad litem each arguing that we should apply those cases to affirm the juvenile court's decision in this case.

¶22 Certainly, statutory grounds can inform the "best interest" inquiry; indeed, in many cases, the facts supporting the conclusion that statutory grounds for termination are present might also support the conclusion that it is in the child's best interest for the parent's rights to be terminated. *See In re J.D.*, 2011 UT App 184, ¶ 33 n.1, 257 P.3d 1062 (Orme, J., concurring) (stating that "it may be that something of a sliding scale exists," and that more weighty grounds for termination might more easily lead to the conclusion that termination is in the child's best interest). For example, it may follow from a finding that a parent has violently or sexually abused his or her child that it is in the best interest of the child to terminate the parent's rights. But there is no support in statute or in Utah Supreme Court case law for a rule requiring such an inference "almost automatically" in every case and, in addition, our development of this principle has created a number of unfortunate problems in our law.

A

¶23 The first problem with essentially merging the "best interest" inquiry into the "statutory grounds" inquiry is that we have removed a useful—and perhaps constitutionally required[5]—tool from our trial judges' toolkits. In the course of hearing all of the evidence in the case, the trial judge gets to know the family in question—she can hear the parent speak, listen to the caseworker's observations, sometimes even hear from the child (or at least a guardian ad litem), and learn more than an appellate court can about the details of the family dynamics at play. In family and domestic cases, our law grants trial judges wide latitude to make factual findings and to craft

---

5. *See supra* ¶ 14 n.1 (citing *In re R.B.F.S.*, 2011 UT 46, ¶ 7 n.6, and noting that "some courts have suggested that a best interests analysis may be constitutionally required before a child's familial relationships can be terminated").

solutions for families and children that make the most sense in the particular situation. *See Harmon v. Harmon*, 491 P.2d 231, 232 (Utah 1971) (stating that "[i]n order to carry out the important responsibility of safeguarding the interests and welfare of children, it has always been deemed that the courts have broad equitable powers"). In short, we allow trial judges in family cases to *do equity*, and the touchstone of that equitable inquiry is to fashion a remedy that is in the best interest of the child. Our "almost automatically" line of cases disempowers trial judges to do equity—to act in the best interest of the child—in cases involving families and children.[6]

---

6. The availability of this equitable tool is important in all cases in which a movant seeks to terminate a parent's rights, but perhaps especially so in cases involving private petitions (filed by someone other than the Utah Division of Child and Family Services (DCFS)) seeking to terminate the rights of a non-custodial parent. In many (but not necessarily all) cases in which DCFS seeks to terminate the rights of a *custodial* parent, that parent will likely have been offered (and not successfully taken advantage of) reunification services. *See* Utah Code Ann. § 78A-6-312(2)(b) (LexisNexis Supp. 2017) (stating that "[w]henever the court orders continued removal" of the child from the home, "the court shall first . . . determine whether . . . reunification services are appropriate"). In private cases where a petitioner seeks to terminate the rights of a *non-custodial* parent, by contrast, no statute requires the court to even consider whether to implement reunification services, and often no infrastructure is in place through which to offer any such services in any event. A rigorous "best interest" analysis sometimes presents the only meaningful opportunity that parents have to demonstrate to the court that, despite the existence of a statutory ground for

(continued…)

B

¶24 The second problem with our "almost automatically" line of cases is that it functionally shifts part of the burden of proof in termination cases, at least on the "best interest" element, from the petitioner (the Utah Division of Child and Family Services (DCFS) or a private party, often another parent or stepparent) to the parent whose rights are at issue. Our legislature has been clear that, in termination cases, trial courts "shall in all cases require the petitioner to establish the facts by clear and convincing evidence." *See* Utah Code Ann. § 78A-6-506(3). We have often articulated this legal principle, *see, e.g.*, *In re R.A.J.*, 1999 UT App 329, ¶ 16, 991 P.2d 1118 (stating that "[t]he burden of proof on the issue of what is in the best interest of the child is upon the petitioner in a termination of parental rights case"), but we have not always implemented it this way in practice. Two cases are illustrative.

¶25 In *In re A.M.O.*, 2014 UT App 171, 332 P.3d 372, the child's stepmother petitioned to adopt the child and to terminate the parental rights of the child's mother. *Id.* ¶¶ 2, 3, 7. The mother "struggled with drug addiction," had been incarcerated for lengthy periods, and had "no meaningful contact" with the child. *Id.* ¶ 4. Based on these facts, the trial court found that the mother had abandoned the child, and no party challenged that finding on appeal. *See id.* But the trial court denied the stepmother's petition to terminate the mother's parental rights, because the trial court found that the stepmother had not carried her burden to demonstrate that termination was in the child's best interest. *Id.* ¶ 6. Specifically, the trial court "stated that it had heard 'very little evidence' on the issue of best interest and

---

(…continued)
termination, they have been recently engaged in significant efforts to improve their lives and remedy their past issues.

had not heard testimony from any therapist indicating how [the child] understood his relationship with [the mother]." *Id.* In the end, the trial court declared that "it had not heard evidence that would convince the court that it would be in [the child's] best interest to terminate [the mother's] parental rights." *Id.* (quotation simplified).

¶26 The trial court's determination—that the stepmother had not carried her burden of proof that termination was in the child's best interest—was supported with reasoned analysis, but we did not affirm it. Instead, we cited our "almost automatically" case law, *id.* ¶ 20, and explained that the trial court did not make an independent finding that "this is one of those rare cases where termination is not in the best interest of the child despite the existence of grounds for termination," and did "not explain why the two requirements for termination are not satisfied hand-in-glove," *id.* ¶ 22. We determined that the court's findings were therefore "conclusory" and "inadequate," *id.* ¶¶ 21–22, and reversed the trial court's order denying the petition, and remanded the case for additional findings, *id.* ¶ 23.

¶27 This analysis relied too heavily on the "almost automatically" concept. It should have been sufficient for affirmance that the trial court made a reasoned, supported finding that the movant had not carried her burden of proof on the best interest element. Trial courts should not have to make any additional finding that a case is "rare" or "unusual" in order to determine that a parent's rights should not be terminated. By imposing this additional requirement, we have placed a burden on the parent whose rights are at issue to come forward at the termination hearing with some evidence demonstrating that the case is "rare" or "unusual." (Certainly, the petitioner (e.g., DCFS) will not have an incentive to bring any such evidence to the trial court's attention.) And we thereby made it incrementally easier for a petitioner to obtain an order of termination of parental rights.

¶28 Similarly, in *In re G.J.C.*, 2016 UT App 147, a child's mother sought to terminate the parental rights of the child's father. *Id.* ¶ 10. The parents' divorce proceedings were particularly contentious, with the mother at one point obtaining a protective order against the father, and with the father on multiple occasions refusing to return the child after parent-time. *Id.* ¶¶ 3–5. On one occasion, the father attempted to kidnap his parents-in-law in connection with a parent-time exchange, at one point even threatening them with a handgun. *Id.* ¶ 7. The father eventually pled guilty to attempted kidnapping, and served prison time. *Id.* ¶ 9. Later, after the termination trial, the court made "careful[] and thorough[]" findings about the reasons for termination, finding five different statutory grounds to terminate the father's rights. *Id.* ¶ 19.

¶29 However, the trial court "concluded that [the mother] failed to meet her burden" of demonstrating that termination of the father's rights was in the best interest of the child. *Id.* ¶ 23. As described in our opinion, the trial court offered five separate reasons why the mother had not met her best-interest burden, including the "lack of another person to step in to the role" as the child's father, the lack of evidence that the child had been harmed by his relationship with the father, and the positive role that the father's extended family played in the child's life. *Id.* We quoted the trial court as finding that "this child could benefit from a positive, loving, nurturing relationship with his extended family," and that it was "possible" for the child to have that kind of relationship with his father also. *Id.* The court therefore denied the mother's petition to terminate the father's parental rights. *Id.*

¶30 Despite the trial court's determination that the mother had not met her burden of proof, we reversed the trial court's decision not to terminate the father's parental rights, concluding that the court's best interest determination was "against the clear weight of the evidence." *Id.* ¶ 33. As we did in *In re A.M.O.*, we cited our "almost automatically" case law, *id.* ¶ 25, and

determined that the trial court's findings regarding statutory grounds for termination could "support only a best-interest determination that termination is appropriate," *id.* ¶ 32 (quotation simplified).

¶31    It is evident that our "almost automatically" case law has, subtly but meaningfully, shifted the burden of proof in termination of parental rights cases, and has imposed a burden on parents whose rights are at issue to bring forth evidence demonstrating that their case is a "rare" or "unusual" case in which, despite the presence of statutory grounds for termination, it is nevertheless in the child's best interest not to terminate. Such burden-shifting is contrary to statutory command. *See* Utah Code Ann. § 78A-6-506(3).

C

¶32    Finally, we also conclude that our "almost automatically" case law is inconsistent with the relatively new statutory language that allows termination of parental rights only when it is "strictly necessary" to do so. Utah Code Ann. § 78A-6-507(1).

¶33    The parties advance various theories about the meaning of the "strictly necessary" language. Father contends that the language was intended to add a third element—a "new and distinct statutory requirement"—to the termination of parental rights test, so that a court considering termination would be required to make a specific finding as to the strict necessity of its decision in addition to finding both grounds for termination and that termination would be in the child's best interest. In contrast, the guardian ad litem contends that the "strictly necessary" language is completely prefatory—essentially meaningless introductory language—and that it does not affect the test at all. For her part, Mother contends that the language did not add a

third element to the termination test, but was instead meant to be analyzed as part of the "best interest" element of the test.[7]

¶34 We discuss the meaning of the "strictly necessary" language more fully later in this opinion. For now, it suffices to note that the only one of these three interpretations that is even potentially consistent with our "almost automatically" line of cases is the interpretation advanced by the guardian ad litem—that the language is simply prefatory and carries no substantive meaning whatsoever—and to explain that we find this argument unpersuasive.

¶35 As a general matter, courts "avoid interpretations that will render portions of a statute superfluous or inoperative." *See Hall v. Utah Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958; *see also State v. Maestas*, 2002 UT 123, ¶ 52, 63 P.3d 621 (stating that "when reading the statutory language, our purpose is to render *all parts* of the statute relevant and meaningful" (quotation simplified)). In this instance, however, the guardian ad litem asserts that the legislature specifically intended the "strictly necessary" language to be a prefatory "statement of policy" that "does not create new rights and obligations." Our supreme court has stated that, where statutes contain "a statement of legislative purpose," a "preamble," or a "declaration of policy," such language "provide[s] guidance to the reader as to how the act should be enforced and interpreted, but [it is] not a substantive

---

7. During oral argument, the juvenile court appeared to espouse this third interpretation, stating that it considered the "strictly necessary" language to be "tied to the best interest analysis" and intended to require trial judges to ask themselves if "there is another feasible option here?" However, in its written ruling, the court ended up analyzing "strictly necessary" as a stand-alone third element.

part of the statute." *See Price Dev. Co. v. Orem City*, 2000 UT 26, ¶ 23, 995 P.2d 1237 (quotation simplified).

¶36 The guardian ad litem's argument fails in this case, for one simple reason: the "strictly necessary" language does not appear in a statutory preamble or statement of legislative policy. *See Westly v. Board of City Comm'rs*, 573 P.2d 1279, 1280 (Utah 1978) (interpreting a section of a statute that was specifically designated as a "declaration of policy," and concluding that it was not a substantive part of the statute (quotation simplified)). Instead, the "strictly necessary" language appears prominently in the first subsection of the "grounds for termination" statute, and states that "if the court finds strictly necessary, the court may terminate all parental rights . . . if the court finds any one" of the statutory grounds for termination to be present. *See* Utah Code Ann. § 78A-6-507(1). This statutory subsection is not a preamble or specifically-identified "statement of policy"; rather, it is a substantive portion of the statute. There is therefore no indication in the statute itself that the "strictly necessary" language was intended to be part of a separate non-substantive preamble or policy statement.[8]

¶37 Because we conclude that the words "strictly necessary" are not merely prefatory and therefore must have substantive

---

8. Moreover, even if the language could be considered part of a non-substantive statutory statement of policy, such statements still "provide guidance to the reader as to how the act should be enforced and interpreted," and can be "used to clarify ambiguities." *See Price Dev. Co. v. Orem City*, 2000 UT 26, ¶ 23, 995 P.2d 1237. Even if construed as a "prefatory" statement of policy, the "strictly necessary" language still strikes us as inconsistent with a body of case law that declares termination of parental rights to follow "almost automatically" from a finding that statutory grounds for termination exist.

meaning, it necessarily follows that those words are inconsistent with case law declaring that termination of parental rights follows "almost automatically" upon a finding that statutory grounds are present. If the words are to have substantive meaning, it cannot be that parental rights are to be terminated "almost automatically" once a court has determined that a statutory ground for termination exists.

¶38 For all of these reasons, we consider the "almost automatically" line of cases highly problematic. It lacks any constitutional, statutory, or Utah Supreme Court support, has led to several practical problems in its implementation, and is inconsistent with the statutory language permitting termination of parental rights only when "strictly necessary."

III

¶39 We recognize, of course, that our concerns about the "almost automatically" line of cases do not necessarily mean that we should disavow it. The determination as to whether a line of cases should be overruled is governed by the principle of horizontal *stare decisis*, by which "one panel on the court of appeals owes great deference to the precedent established by a different panel on the court of appeals." *State v. Legg*, 2018 UT 12, ¶ 9, 417 P.3d 592. There are "two broad factors" that we should consider before overruling any precedent: "(1) the persuasiveness of the authority" and the "reasoning on which the precedent was originally based"; and "(2) how firmly the precedent has become established in the law since it was handed down." *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553. This second factor "encompasses a variety of considerations, including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.*

¶40   Applying this standard to the case at hand, the first factor weighs heavily in favor of disavowal. As we have explained, the "almost automatically" line of cases is unsupported, and we have set forth several different problems with those cases.

¶41   The second factor also weighs in favor of disavowal. Although superficially it may appear that this line of cases is well-established in the law, having been first introduced in 1988, a close analysis indicates that this precedent is not as firmly established in the law as one might think. Contrary to the guardian ad litem's argument, our supreme court has never adopted it or even referred to it.[9] As discussed above, our supreme court still appears to apply the original two-part test in termination of parental rights cases, with each part apparently remaining robust. *See In re T.E.*, 2011 UT 51, ¶¶ 17–18; *In re A.C.M.*, 2009 UT 30, ¶ 23. Indeed, on one occasion, that court specifically rejected the argument that "any distinction (between the best interest and unfitness [parts of the test]) is a mere matter of semantics." *See In re J.P.*, 648 P.2d at 1368.

¶42   Moreover, our "almost automatically" line of cases is also at odds with some of our own case law. For instance, in *In re R.A.J.*, 1999 UT App 329, we affirmed a juvenile court's decision

---

9. The guardian ad litem asserts that the Utah Supreme Court has endorsed the "almost automatically" concept, and directs our attention to *In re B.R.*, 2007 UT 82, 171 P.3d 435. We disagree with the guardian ad litem's reading of that case. The opinion in *B.R.* contains no mention of or citation to any of our "almost automatically" cases. Moreover, the fact-bound holding of *In re B.R.*—reversing our decision to overturn a juvenile court's termination order—cannot be construed as supporting the general notion that, once grounds for termination are adjudged to be present, it follows "almost automatically" that the best interest of the child will be served by termination.

to deny a petition for termination of parental rights. *Id.* ¶¶ 1, 24. On appeal, the petitioners argued that, once the juvenile court found statutory grounds for termination, it should have presumed "that termination was in the child's best interests." *Id.* ¶ 21. We rejected that argument because "[t]here is no such presumption in Utah." *Id.* Indeed, we stated that if we were to adopt that position, "it would make little sense to employ the two-step analysis required by Utah law" in termination cases. *Id.* ¶ 22. We further noted that "[b]oth parts of the analysis are necessary, as required by the statutory arrangement adopted by the Utah Legislature, and both must be proven by those seeking termination of the parent-child relationship." *Id.* Neither our decision in *R.A.J.*, nor any of our other cases to speak in similar terms,[10] has ever been overruled or otherwise called into question, and thus there exist contrary lines of case law in our jurisprudence.[11]

---

10. *See, e.g.*, *In re Adoption of T.H.*, 2007 UT App 341, ¶ 10, 171 P.3d 480 (stating that "even assuming that proper grounds to terminate [the father's] parental rights existed under [the statute], [the stepfather's] failure to provide clear and convincing evidence that it would be in [the child's] best interests to terminate [the father's] parental rights is a fatal defect to termination"); *In re E.R.*, 2001 UT App 66, ¶ 13, 21 P.3d 680 (stating that "[i]t is conceivable that grounds for termination may exist, but termination nonetheless is not in the best interest of the children").

11. Although the "almost automatically" concept was first introduced in *In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct. App. 1988), that case did not use the phrase "almost automatically." The first time that language appeared was in a concurring opinion over two decades later. *See In re J.D.*, 2011 UT App 184,

(continued…)

¶43     Finally, our precedent has not, in our view, engendered any meaningful "reliance" upon it such that disavowal would "create injustice" or upset litigants' expectations. One way this principle could come into play in this situation is if the disavowal of our line of cases could allow parents whose rights were terminated thereunder to come back into court and re-litigate the termination issues. For better or for worse, however, our law contains no provision—other than a full-scale re-adoption—permitting a parent whose rights have been terminated to regain those rights. *See* Utah Code Ann. § 78A-6-513(1) (LexisNexis Supp. 2017) (stating that a termination order "divests the child and the parents of all legal rights, powers, immunities, duties, and obligations with respect to each other, except the right of the child to inherit from the parent"); *see also*

---

(…continued)
¶ 34, 257 P.3d 1062 (Orme, J., concurring). In that case, the majority did not ratify the "almost automatically" concept. *See id.* ¶ 27. Moreover, the concurring opinion included a "but see" citation to *In re R.A.J.*, appearing to acknowledge that our holding in *In re R.A.J.* was contrary to the conclusions reached in the concurring opinion. *See id.* ¶ 34 (Orme, J., concurring) (citing *In re R.A.J.*, 1999 UT App 329, ¶¶ 21–22, 991 P.2d 1118). In *In re A.M.O.*, we cited *In re R.A.J.*, *see In re A.M.O.*, 2014 UT App 171, ¶ 18, 332 P.3d 372, but only as an example of the kind of "rare" case in which termination is not in the best interest of the child despite the existence of statutory grounds for termination. In *In re Z.J.*, 2017 UT App 118, ¶ 3, 400 P.3d 1230 (per curiam), we likewise cited to *In re R.A.J.*, and did so for the proposition that "Utah law requires a court to make two distinct findings before terminating a parent-child relationship," *id.* (quotation simplified), but did not discuss *In re R.A.J.*'s contrary holding in connection with our reference to the "almost automatically" principle, *id.* ¶ 9.

*id.* § 78A-6-514(4) (LexisNexis 2012) (stating that even a "voluntary relinquishment or consent for termination of parental rights . . . may not be revoked"). Any rule we might announce regarding disavowal would apply only prospectively, and would not allow, for instance, the parents whose rights were terminated in *A.M.O.* and *G.J.C.* to re-open those cases and thereby upset whatever permanency and stability those rulings fostered. There is therefore no reliance-based reason to shrink from disavowal of our "almost automatically" line of cases.

¶44　For all of these reasons, the principle of *stare decisis* is no bar to disavowal of our precedent in this area. Accordingly, we disavow our prior cases to the extent they suggest that, once statutory grounds for termination are established, it follows "almost automatically" that termination will be in the best interest of a child, or that it is only in "rare" or "unusual" cases that termination of parental rights will not follow from a finding of statutory grounds for termination.[12]

IV

¶45　We must now address the specific questions raised by the facts of this case, and we do so unconstrained by our "almost automatically" line of cases. First, we examine the "strictly necessary" language in Utah Code section 78A-6-507(1), and determine its meaning. Second, and relatedly, we address the precise question Father raises, namely, whether termination of parental rights can ever be "strictly necessary" if no adoption or other alternative parenting arrangement is contemplated.

---

12. Those cases include the following: *In re Z.J.*, 2017 UT App 118, ¶ 9; *In re G.J.C.*, 2016 UT App 147, ¶ 25; *In re A.M.O.*, 2014 UT App 171, ¶ 20; *In re D.R.A.*, 2011 UT App 397, ¶ 21, 266 P.3d 844; *In re J.R.T.*, 750 P.2d at 1238.

Finally, we must consider whether the juvenile court correctly applied governing legal principles to the facts of this case.

A

¶46    As noted earlier, the parties advance three different interpretations of the "strictly necessary" language. We have already rejected the interpretation proposed by the guardian ad litem. We now examine the other two arguments, and in the end we are persuaded, in general, by the interpretation advanced by Mother and (at least at the hearing) endorsed by the juvenile court: that the "strictly necessary" language does not create a separate third element of the test for termination of parental rights but, instead, should be considered as an important part of the "best interest" inquiry.

¶47    The "best interest" test is broad, and is intended as a holistic examination of all of the relevant circumstances that might affect a child's situation. More than a century ago, our supreme court noted that the concept included examination of "the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child," and that the best interest of the child, so defined, was the "paramount consideration" in cases involving termination of parental rights. *See Harrison v. Harker*, 142 P. 716, 719 (Utah 1914) (quotation simplified). As far as we are aware, the breadth of the "best interest" inquiry has never been diminished; indeed, we have recently defined the "best interest" inquiry as a "subjective assessment based on the totality of the circumstances" surrounding the child. *See In re G.J.C.*, 2016 UT App 147, ¶ 24.

¶48    Surely a test this broad, and intended to capture all of the relevant facts and circumstances unique to a particular child's situation, is sufficiently comprehensive to encompass an inquiry into whether termination of a parent's rights is actually necessary. Indeed, at times, we have spoken in similar terms. *See,*

*e.g.*, *In re S.T.*, 928 P.2d 393, 401 (Utah Ct. App. 1996) (concluding, in the context of applying the two-part test, that "under these difficult circumstances, termination of appellants' parental rights is necessary").

¶49　Unfortunately, as discussed herein, we have not always applied the "best interest" test correctly in termination cases. By sometimes effectively collapsing the "best interest" analysis into the "statutory grounds" analysis through our "almost automatically" line of cases, we have unnecessarily narrowed the best interest test and deprived it of some of its vitality. Given the existence of our "almost automatically" line of cases, it is no wonder that some attorneys (including Father's attorney) have, in recent years, argued for the "strictly necessary" language to be construed as creating a new, third element of the termination test. But there is no need to view it this way, so long as the "best interest" element is applied independently. *See In re J.P.*, 648 P.2d at 1368 (stating that "[t]he best interest of the child has always been a paramount or 'polar star' principle in cases involving termination of parental rights").

¶50　We therefore conclude that, as part of the "best interest" analysis required by the second element of the two-part test, along with all of the other facts and circumstances relevant to the case, trial courts should analyze whether termination of a child's parent's rights is "strictly necessary."

¶51　In terms of what "strictly necessary" actually means, the phrase is not defined in the relevant statutory section. If it were, "we would of course look there first." *See O'Hearon v. Hansen*, 2017 UT App 214, ¶ 24, 409 P.3d 85. Because it is not defined in the statute, and because we are unaware of any specialized meaning of the phrase that ought to apply, we must interpret the statutory language "according to the plain meaning of [its] text." *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (quotation simplified).

¶52 As a "starting point" toward ascertaining legislative intent from plain language, we look to dictionary definitions of the words the legislature used. *See State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719. All dictionaries that we consulted, or that were brought to our attention during this case, define "necessary" in terms of being "needed," "absolutely needed," or "essential." *See*, *e.g.*, *Necessary*, Cambridge Dictionary, http://dictionary.cambridge.org/us/dictionary/english/necessary [https://perma.cc/2NNR-KKRM] ("needed in order to achieve a particular result"); *Necessary*, English Oxford Living Dictionaries, http://en.oxforddictionaries.com/definition/necessary [https://perma.cc/555C-DJ4S] ("needed to be done, achieved, or present; essential"); *Necessary*, Merriam-Webster, www.merriam-webster.com/dictionary/necessary [https://perma.cc/K67R-DA6L] ("absolutely needed"); *Necessary*, Webster's Third New Int'l Dictionary 1510–11 (1993) ("that cannot be done without; that must be done or had; absolutely required; essential, indispensable").

¶53 Adding the modifier "strictly" in front of "necessary" strengthens the phrase; indeed, the word "strictly" is commonly defined as "completely" or "entirely," or "with no exceptions." *See*, *e.g.*, *Strictly*, Cambridge English Dictionary, dictionary.cambridge.org/us/dictionary/english/strictly [https://perma.cc/Y7MT-SDWM] ("completely or entirely"); *Strictly*, English Oxford Living Dictionaries, en.oxforddictionaries.com/definition/strictly [https://perma.cc/P9XQ-ZL5D] ("with no exceptions; completely or absolutely"); *Strict*, Merriam-Webster,www.merriam-webster.com/dictionary/strict [https://perma.cc/3YQT-TKDS] ("inflexibly maintained or adhered to"); *Strictly*, Webster's Third New Int'l Dictionary 2261 (1993) ("without latitude").

¶54 Accordingly, when we give the words "strictly necessary" their plain meaning, we understand that the legislature intended for courts to terminate parental rights only in situations when it is absolutely essential to do so. Because this analysis should

occur within the context of the "best interest" examination, it should be undertaken from the child's point of view, not the parent's. A court should not ask whether termination is strictly necessary to further an objective of one of the parents; instead, courts should ask whether it is absolutely essential to the child's best interest that a parent's rights be permanently severed.

¶55    The "best interest" inquiry requires courts to examine all of the relevant facts and circumstances surrounding the child's situation, not just the specific statutory grounds for termination. In particular, and as the juvenile court here recognized, this part of the inquiry also requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights. In some cases, alternatives will be few and unsatisfactory, and termination of the parent's rights will be the option that is in the child's best interest. But in other cases, especially those in which grandparents or other family members have (or are willing to) come forward to care for the child, courts should consider whether other less-permanent arrangements (for instance, a guardianship with a family member) might serve the child's needs just as well in the short term, while preserving the possibility for rehabilitation of the parent-child relationship in the longer term. In many cases, children will benefit from having more people—rather than fewer—in their lives who love them and care about them, and if there is a practical way to keep parents involved in the children's lives that is not contrary to the children's best interests, a court should seriously consider such an option. *See In re A.H.*, 716 P.2d at 287 (stating that "[t]he termination of parental rights is a drastic measure that should be resorted to only in extreme cases"). As discussed above, a parent's right to raise her child is a fundamental right, and although courts must view the "best interest" element from the perspective of the child, in so doing courts should not forget the constitutional dimension of the

parental rights on the other side of the ledger. S*ee In re Castillo*, 632 P.2d at 856 (stating that "it is not our view . . . that the termination of parental rights can be decreed without giving serious consideration to the prior and fundamental right of a parent to rear his [or her] child").

B

¶56　We are not persuaded, however, by Father's argument that it can never be "strictly necessary" to terminate a parent's rights if no pending adoption or similar change in the child's permanent living situation is contemplated. Whether an adoption is pending is but one of many circumstances that a trial court must consider in determining whether termination of a parent's rights is in the child's best interest. *See In re J.D.*, 2011 UT App 184, ¶ 23 (stating that "a child's adoption status is only one factor to consider in the determination of the best interests of the children" (quotation simplified)). We certainly acknowledge that the absence of any proposed change in the child's custody or living situation is a factor that may weigh against termination in some cases, including this one. *See id.* (stating that the juvenile court in that case had correctly "[a]cknowledg[ed] that the lack of an adoptive placement weighed against" termination). But the absolute rule that Father advances—that termination can *never* be "strictly necessary" without a pending adoption, no matter whatever other circumstances are present—goes too far.

¶57　Indeed, it is not at all difficult to imagine situations in which a parent's actions toward the child are so abusive that it would be in the child's best interest to terminate the parent's rights, irrespective of the child's prospects for another long-term living situation. *See, e.g.*, *In re J.A.*, 2018 UT App 29, ¶¶ 15, 21 (a juvenile court terminated a parent's rights after finding, in a child abuse case in which the child suffered a brain injury, that the parent had severely abused one of the children, even though no change in the children's custody situation was contemplated).

Accordingly, we cannot interpret the phrase "strictly necessary" in the manner Father urges.

C

¶58 Having clarified the contours of the termination of parental rights test, we finally turn our attention to whether the juvenile court correctly applied that test in this case. Father does not contest the existence of statutory grounds for termination of his parental rights, but argues that the juvenile court erred by determining that termination of his rights was in the Children's best interests or strictly necessary. Father spends much of his energies asserting that it can never be "strictly necessary" to terminate a parent's rights if there is no contemplated change in the affected child's living situation, an argument we have already rejected, along with his argument that the "strictly necessary" language was intended to create a separate third element to the test for termination of parental rights.

¶59 However, given our holding that the "strictly necessary" analysis is properly part of the "best interest" element, we construe Father's arguments regarding "strictly necessary" as a challenge to the juvenile court's conclusion that termination of his rights was in the Children's best interests. And although the juvenile court was on the right track for much of its "best interest" analysis, at one point even stating that it "struggle[d] with" the "almost automatically" language, its examination of the issues was framed by a test we have herein clarified and reformulated.[13]

_____

13. Indeed, Mother specifically argued in her written briefing to the juvenile court that "where grounds for termination are established such as [in] the instant case, the conclusion that termination will be in the child's best interests will follow almost

(continued…)

¶60 For these reasons, we think it best to vacate the juvenile court's termination order, and remand the case for reconsideration in light of this opinion. We do not, however, make any effort to urge the juvenile court to reach one conclusion or another upon reconsideration. We instruct the juvenile court to reconsider the "best interest" portion of the termination test, and to do so in keeping with the principles set forth herein, and without constraint from the "almost automatically" line of cases. We leave it to the juvenile court to determine whether a new evidentiary hearing is necessary, or whether it can adequately reassess "best interest" based on the evidence previously presented, aided by additional briefing and/or oral argument.

CONCLUSION

¶61 A parent's right to raise his or her child is a fundamental right guaranteed by the federal and state constitutions. Our line of cases holding that termination of parental rights should follow in all cases "almost automatically" if one or more of the statutory grounds for termination of parental rights is present was ill-advised, unsupported by statute or case law, and in

---

(…continued)
automatically," and in support cited this court's decision in *In re Z.J.*, 2017 UT App 118, ¶ 9. Moreover, at the hearing, Mother's counsel argued that the "almost automatically" line of cases applied in this case and compelled the termination of Father's rights, and the juvenile court considered that authority and discussed it with counsel at the hearing. In this opinion we have disavowed the "almost automatically" line of cases, specifically including *In re Z.J.*, and to the extent the juvenile court relied upon those cases, its conclusions require reconsideration.

tension with the constitutional rights of parents. For the reasons set forth herein, we disavow that line of cases.

¶62    The test for termination of parental rights has two parts, and the second part—that termination of parental rights must be in the best interest of the affected child—must be considered on its own merits, separate from whether statutory grounds for termination are present. In considering the "best interest" element, trial courts should think carefully about whether termination of parental rights is "strictly necessary," including whether other options short of termination exist that might adequately address the family's issues.

¶63    Because we have disavowed a line of our cases and clarified the test for termination of parental rights, we vacate the juvenile court's termination order, and remand this case to the juvenile court for further proceedings consistent with this opinion.

—————