**2023 UT App 66**

# THE UTAH COURT OF APPEALS

IN THE INTEREST OF L.L.B.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

C.B. AND H.B.,
Appellees,
*v.*
J.B.,
Appellant.

Opinion
No. 20210942-CA
Filed June 15, 2023

Eighth District Court, Vernal Department
The Honorable Clark A. McClellan
No. 182800015

Emily Adams, Sara Pfrommer, Melissa Jo Townsend,
and Freyja Johnson, Attorneys for Appellant

Michael D. Harrington and Cameron M. Beech,
Attorneys for Appellees

A. Erin Bradley Rawlings, Guardian ad Litem

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1      C.B. (Mother) and H.B. (Stepfather) filed a petition seeking termination of J.B.'s (Father) parental rights to L.L.B. (Child) and adoption by Stepfather. After a one-day bench trial, the district court found four statutory grounds for termination. The court also concluded it was in Child's best interest to terminate Father's parental rights and that doing so was strictly necessary so Child could be adopted by Stepfather. Father appeals the district court's

conclusion that termination of his parental rights was in Child's best interest, arguing it was not supported by clear and convincing evidence. We agree with Father that the evidence was insufficient and, therefore, reverse the district court's ruling terminating Father's parental rights.

BACKGROUND

¶2     Child was born in September 2009. Less than a week after her birth, Father relapsed on controlled substances and left Child and Mother. Shortly thereafter, Child and Mother moved from the Salt Lake City area to Vernal, Utah. In the months after Mother and Child moved to Vernal, Father saw Child twice—in December 2009 and in April 2010.

¶3     In April 2010, Mother and Father entered into a stipulated agreement of paternity. The decree awarded primary physical custody and sole legal custody to Mother with Father awarded parent-time. It also permitted Mother to request that Father submit to random urinalysis drug testing up to eighteen times a year.

¶4     For several years Father consistently exercised his rights to parent-time. Because Mother lived in Vernal with Stepfather, whom she married in 2013, and Father lived in Salt Lake City, the parties met in Fruitland, Utah to exchange Child. In July 2015, however, Mother and Father got into an argument during an exchange and Child immediately returned to Vernal with Mother and Stepfather. Mother testified that the same month as the confrontation in Fruitland, Child and Father were involved in a four-wheeler accident. For the next several weeks, Mother refused to permit Child to spend parent-time with Father because she was concerned Father had been drinking at the time of the accident. Parent-time resumed after Father sought an order to show cause

in the paternity matter.[1] Beginning in April 2016, the parent-time was supervised by Father's mother because Mother was concerned that Father was using drugs and alcohol around Child.

¶5     In August 2016, Mother and Father discussed the possibility of Father voluntarily relinquishing his parental rights. Mother testified Father was "on the fence" about the idea, and Father admitted he considered it for approximately two months. However, the parties were unable to reach a voluntary agreement. In 2018, Mother and Stepfather filed a Petition for Adoption/Termination of Parental Rights in district court. The petition listed the following grounds supporting the termination of Father's parental rights: (1) Father abandoned Child, (2) Father neglected Child, (3) Father was an unfit parent, and (4) Father made only token efforts to be a fit parent. Father filed a handwritten response opposing the petition and later filed a counseled answer.

¶6     The district court held a one-day bench trial on November 5, 2021. Mother, Father's ex-girlfriend (Ex-Girlfriend), Father's mother, Father's brother, and Father testified. A guardian ad litem (the GAL) appointed by the district court represented Child.

¶7     Mother's testimony centered on Father's lengthy absences from Child's life, his history of failing to provide financial support for Child, and his past substance abuse. She testified that in February 2017, she asked Father to take a drug test, but he refused. In the months after that refusal, Father attempted to contact Child only twice—once in May 2017 and once more in December 2017. Nearly a year passed until Mother heard from Father again. As to Father's history of supporting Child, evidence was presented that he made court-ordered child-support payments from 2010

---

1. Mother testified she permitted Child to spend time with Father after he sought court intervention because she was afraid she "would get put in jail for not allowing the visitations."

through 2016, but the payments were not for the full amounts ordered. From 2017 forward, Father's child-support payments totaled seventy-two dollars, and as of September 1, 2021, he was $51,011.25 in arrears. Mother testified that Father had never followed through with his many promises to pay child support, refrain from using drugs and alcohol, and re-establish a relationship with Child. She also testified he had never been involved in Child's education. Mother admitted, however, that since the termination petition was filed, she had not responded to Father's requests to see Child and had not told Child about the requests.

¶8      Ex-Girlfriend testified that she and Father dated from 2009 until 2016. She described his alcohol consumption during that period as progressing from weekends to daily. Ex-Girlfriend also testified that Father told her either in 2015 or 2016 that he was using crack cocaine and she found illegal substances in their home and car in 2016. She also confirmed Father was drinking the day he and Child were involved in the four-wheeler accident in July 2015. Ex-Girlfriend testified she now communicates with Father only to discuss matters concerning their daughter, Child's half-sister (Half-Sister). According to Ex-Girlfriend, Father spends parent-time with Half-Sister and has "a strong relationship" with her. She also testified that Child and Half-Sister have a good relationship that is facilitated and encouraged by her and Mother.

¶9      Father's mother testified about Father's relationship with Half-Sister, describing it as a "great relationship" and calling him "a wonderful father." She testified that she tries to stay in contact with Child, but recently has had difficulty getting responses from Mother. According to Father's mother, Father's family last saw Child at a family reunion in the summer of 2020. She stated that Father had substance abuse issues "off and on" from 2009 through 2019 but she was not aware of any substance abuse since 2019.

¶10    Father's brother testified that "since [Father] put his life back together," Father has been an "incredible father" and an "incredible uncle." He also testified about the family reunion, stating Child attended the reunion and he saw her interact with Father. He stated they "spent a lot of time together and had a lot of fun."

¶11    Father testified he saw Child "a lot" during the first five years of her life and had a good relationship with her. Thereafter, he saw Child off-and-on until August 2016, after which time he did not see her again until 2020 at the family reunion. He admitted their interactions at the reunion were "a little awkward at first" but testified they "ended up having a blast." He testified he admitted to Child during the reunion that he had not been the best parent and apologized. According to Father, Child responded well to his apology and gave him a hug. Father testified he had not seen Child since the reunion, although he had written letters to Mother, sent a gift, and emailed Child.

¶12    Father admitted he had relapsed on controlled substances three or four times between 2009 and 2019, but testified he has been clean and sober since he went to jail in January 2019. Father testified he participated in drug court after a term of incarceration, calling it "awesome" and "one of the best things" he ever did. As part of drug court, he participated in outpatient treatment, community service, and drug testing. He testified he now works with at-risk children as a boxing coach and was now paying child support.

¶13    The GAL stated Child does not have a relationship with Father because he "wasted that relationship and allowed it to shrivel by his absence and his lack of effort to nourish it." The GAL described Stepfather as "an excellent father" to Child and stated the two have "a great bond" and "a very close relationship."

¶14 The district court entered detailed Findings of Fact and Conclusions of Law on December 3, 2021. The court concluded four statutory grounds for termination existed and the bulk of its ruling addressed those grounds. The court found Father abandoned Child by failing to maintain contact with her, neglected Child by not paying child support, and made only token efforts to support Child or communicate with her. Although the court found that Father was "a fit and proper parent" at the time of the hearing, it nevertheless concluded Father was unfit or incompetent for purposes of the statutory grounds for termination because he was unfit and incompetent for much of Child's life.

¶15 The district court's best-interest analysis was considerably shorter than its analysis of the statutory grounds for termination. The court identified and examined three factors: (1) whether another person was available to step into the parental role, (2) whether there was evidence Child had been harmed by her relationship with Father, and (3) whether Father's extended family was a positive influence in Child's life. Based on that analysis, the court ruled as follows: "The Child desires and deserves to have [a] healthy, stable family relationship with the person that has been and acts as her father figure. The Child's interest will best be served if the adoption is allowed to move forward. . . . Because the adoption cannot occur without the termination of Father's parental rights, the Court finds by clear and convincing evidence that it is 'strictly necessary' that Father's rights be terminated."

## ISSUE AND STANDARD OF REVIEW

¶16 Father challenges the district court's conclusion that termination of his parental rights was in Child's best interest. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. A lower court's best-interest ruling is reviewed deferentially

but "we will not only consider whether any relevant facts have been left out but assess whether the . . . court's determination that the clear and convincing standard had been met goes against the clear weight of the evidence." *In re G.D.*, 2021 UT 19, ¶ 73, 491 P.3d 867 (cleaned up).

ANALYSIS

¶17    A court must make two findings before terminating a parent-child relationship:

> First, a trial court must find that one or more of the statutory grounds for termination are present. . . . Second, a trial court must find that termination of the parent's rights is in the best interests of the child. . . . The trial court must make both of these findings not merely by a preponderance of the evidence, but by clear and convincing evidence and the burden of proof rests with the petitioner.

*In re B.T.B.* (*BTB I*), 2018 UT App 157, ¶ 13, 436 P.3d 206, *aff'd*, 2020 UT 60, 472 P.3d 827 (cleaned up). "A court may . . . terminate parental rights only when it concludes that a different option is in the child's best interest and that termination is strictly necessary to facilitate that option." *In re B.T.B.* (*BTB II*), 2020 UT 60, ¶ 66, 472 P.3d 827.

¶18    Mother and Stepfather argue that a district court is not required to undertake the strictly necessary part of the analysis when a petition is filed under the Adoption Act rather than the Termination of Parental Rights Act. *Compare* Utah Code § 78B-6-112(5)(e) ("The district court may terminate an individual's parental rights in a child if . . . the individual's parental rights are terminated on grounds described in Title 80, Chapter 4, Termination and Restoration of Parental Rights, and termination is in the best interests of the child."), *with* Utah Code

§ 80-4-301(1) ("[I]f the juvenile court finds termination of parental rights, from the child's point of view, is strictly necessary, the juvenile court may terminate all parental rights with respect to the parent . . . .") (formerly codified at § 78A-06-507(1)). But we need not address Mother and Stepfather's argument, because even without considering the strictly necessary part of the best-interest analysis dictated by the Termination of Parental Rights Act, we conclude, below, that there is not clear and convincing evidence supporting the district court's conclusion that termination of Father's parental rights was in Child's best interest.

¶19 Father first argues the court erred in finding he was an unfit or incompetent parent as a ground for termination because, in his view, the statute requires a finding based on current ability rather than past conduct, and the court found him to be a fit parent at the time of the trial. But Father concedes that three other statutory grounds for termination exist. Because the finding of just one statutory ground for termination is sufficient, it is unnecessary to address Father's argument as to the fitness ground. *See id*. § 80-4-301(1); *In re S.M.*, 2017 UT App 108, ¶ 4, 400 P.3d 1201 (per curiam) ("[T]he finding of a single ground will support termination of parental rights.").

¶20 Father next argues that Mother and Stepfather—the parties seeking termination of his parental rights—failed to present clear and convincing evidence that termination of his parental rights was in Child's best interest. *See BTB II*, 2020 UT 60, ¶ 52. He does not challenge any of the district court's findings as clearly erroneous, but asserts that those findings and the evidence underpinning them do not support the court's ruling. In Father's view, the only support for the district court's ruling was Mother's testimony that Stepfather and Child love and care for each other and the report of the GAL stating that Child (1) was not

comfortable around Father, (2) had a close relationship with Stepfather, and (3) wanted to be adopted by Stepfather.

¶21 The best-interest inquiry "is intended as a holistic examination of all of the relevant circumstances that might affect a child's situation." *Id*. ¶ 29 (cleaned up). The lower court must consider the "physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *BTB I*, 2018 UT App 157, ¶ 47 (cleaned up). The analysis is undertaken from the child's point of view. *BTB II*, 2020 UT 60, ¶ 64. In making the best-interest determination in this matter, the district court analyzed whether there was (1) another person available to step into the parental role, (2) evidence Child had been harmed by the relationship with Father, and (3) a positive role that Father's extended family played in Child's life. After considering these three factors,[2] the district court concluded that termination of Father's parental rights and adoption by Stepfather was in Child's best interest because she "desires and deserves to have a healthy, stable family relationship with the person that has been and acts as her father figure." But the record does not contain clear and convincing evidence supporting this conclusion that termination of Father's parental rights was in Child's best interest.

---

2. It is unclear why the district court focused exclusively on these three particular factors. Under the required holistic approach, there is no exhaustive list of relevant factors and no one factor deemed relevant by a court is determinative on the question of a child's best interest. *See In re J.P.*, 2021 UT App 134, ¶ 14, 502 P.3d 1247 ("While courts have identified factors relevant to the best-interest determination, the list is non-exhaustive."); *In re G.J.C.*, 2016 UT App 147, ¶ 24, 379 P.3d 58 (setting out a non-exhaustive list of factors a court may consider), *abrogated on other grounds by In re B.T.B.*, 2018 UT App 157, 436 P.3d 206, *aff'd*, 2020 UT 60, 472 P.3d 827.

¶22 As to whether another person was available to step into the parent role, the district court detailed evidence showing Child loves Stepfather and Stepfather has been a positive presence in Child's life for many years. It was undisputed that Child has lived with Mother and Stepfather since 2013. The GAL told the district court that Child "is consistent in her desire to be adopted" by Stepfather, has a close relationship with him, and does not view Father as a father figure. The court found Child wants to be adopted by Stepfather and the two have an excellent relationship. But there was no evidence that this relationship will not continue if Father's rights are not terminated and the adoption does not occur.

¶23 Mother and Stepfather suggest that "failing to terminate Father's parental rights so that Stepfather can adopt inherently leaves the Child's relationship with Stepfather, and possibly the Child's siblings and extended family, vulnerable to termination at any time by . . . Mother's death." But such a concern is present in many termination cases, and it does not necessarily lead to the conclusion that termination of a parent's rights is in the child's best interest. As our supreme court has explained, "categorical concerns" about the lack of permanence of an option other than adoption are not enough, otherwise "termination and adoption would be strictly necessary across the board." *In re J.A.L.*, 2022 UT 12, ¶ 24, 506 P.3d 606.

¶24 When considering whether Child had been harmed by the relationship with Father, the court found that Child does not have a relationship with Father and noted Child has expressed some concern for her safety when she is with him. There was no finding, however, that Father's presence in her life has affirmatively harmed Child. The GAL told the court that Child does not have a comfortable relationship with Father and "there's a certain level of fear." But the GAL did not explain or expound on the root of this fear. Further, there was no finding detailing how Child's life was negatively affected or disrupted by Father's attempts to

exercise his parental rights. There is evidence Father has emailed Child a handful of times since the termination petition was filed, but there was no testimony or other evidence that these emails had any negative effect on Child's general welfare or happiness.[3] Father also sent communications to Mother asking for an opportunity to meet with Child, but Mother testified she did not respond and did not put Father in contact with Child because Child would not be receptive. Mother's testimony, however, did not discuss the effects Father's past attempts at reconciliation had on Child or provide an explanation of why she believed Child would not want to see Father. In short, there is no evidence showing Father's presence in Child's life has a negative effect on her happiness and well-being.

¶25 Regarding Child's relationship with Father's extended family, the court found that Child has had a relationship with Father's mother for all her life and the relationship is important to Child. There was also evidence that Child has a strong bond with Half-Sister. Several witnesses testified about Child's attendance at Father's family reunion in the summer of 2020. Mother testified that Child called her and was "begging to stay with her cousins." Father's brother testified there was some initial awkwardness between Child and Father at the reunion "but they spent a lot of time together and had a lot of fun." The district court described the weekend as a "huge success" and "enjoyable and successful." Based on this evidence, the district court found that Child currently has positive and beneficial relationships with Father's extended family, including Half-Sister and Father's mother.

¶26 The district court found that Child's relationships with Father's extended family would be adversely affected to some extent if Father's parental rights were terminated and Child was adopted by Stepfather, and then it purported to compare those

---

3. Child responded to only one of Father's emails. On September 2, 2020, she sent an email simply stating, "Love you."

effects to the benefits Child would glean from a relationship with Stepfather and his family. But there was no evidence presented identifying those benefits or explaining how Child's ability to maintain relationships with Stepfather and his family would be negatively affected if she was not adopted.

¶27 Despite the district court's statement that termination was in Child's best interest because she deserves to have a healthy and stable family relationship, the court made no finding that Child's current living situation was not healthy and stable. Nor did the court make any finding that her living situation will change in any way if she is not adopted. *See BTB I*, 2018 UT App 157, ¶ 56. ("[T]he absence of any proposed change in the child's custody or living situation is a factor that may weigh against termination in some cases . . . .").

¶28 In sum, the evidence on which the district court relied does not clearly and convincingly demonstrate that termination of Father's parental rights was in Child's best interest.

¶29 Other evidence before the district court further undermines, rather than supports, the district court's ruling that termination of Father's parental rights was in Child's best interest. Most obvious and significant is the court's finding that "Father is presently fit and capable as a parent." This finding was based on evidence that Father was clean and sober at the time of the termination trial and had been for more than two years. *See In re B.R.*, 2007 UT 82, ¶ 13, 171 P.3d 435 ("In termination cases, the . . . court must weigh a parent's past conduct with her present abilities."). Father testified he has made many attempts to communicate with Child since his release from incarceration in 2019 and many of those communications were introduced at trial.

¶30 As we have explained, "in making its best-interest determination, . . . especially in cases (like this one) initiated by private petition, it is important for courts to carefully assess a parent's efforts to improve and, if the court remains unpersuaded

that the parent's situation has sufficiently changed for the better, to specifically set forth reasons why it remains unpersuaded." *In re J.J.W.*, 2022 UT App 116, ¶ 30, 520 P.3d 38 (cleaned up). But the district court wasn't unpersuaded that Father had improved his situation for the better. To the contrary, it was persuaded that Father had successfully addressed his problems with controlled substances and found that "Father is presently fit and capable as a parent."

¶31 The Utah legislature "has made clear that, as a matter of state policy, the default position is that it is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents." *BTB II*, 2020 UT 60, ¶ 65 (cleaned up). The district court's order contains no analysis of why it was in the best interest of Child to terminate the parental rights of a fit and capable Father in order to be adopted by Stepfather.

¶32 The record also indicates Father currently considers Child's needs when he makes decisions on her behalf. For example, the district court's order contains details surrounding Child's desire to participate in a religious ceremony with Mother, Stepfather, and their other children. The court found that Father was at first reluctant to consent to Child's participation but relented when he learned Child strongly desired to participate.

¶33 Nearly all the evidence presented at trial was offered in support of the statutory grounds for termination—not the best-interest inquiry. Although the district court was free to consider the evidence supporting the statutory grounds for termination when conducting the best-interest analysis, almost none of that evidence focused on Child's "physical, intellectual, social, moral, and educational training and general welfare and happiness" as required under the holistic approach. *BTB I*, 2018 UT App 157, ¶ 47 (cleaned up). And, as explained above, the evidence that did address Child's best interest largely countered,

rather than supported, the conclusion that termination of Father's parental rights was in her best interest.

¶34    Thus, we are convinced the district court's conclusion that termination of Father's parental rights was in Child's best interest goes against the clear weight of the evidence.

## CONCLUSION

¶35    Because the district court's ruling that termination of Father's parental rights was in Child's best interest goes against the clear weight of the evidence, we reverse and remand with instruction to vacate the order terminating Father's parental rights.

———————