2024 UT App 34

# THE UTAH COURT OF APPEALS

IN THE MATTER OF THE ADOPTION OF J.E., E.E., AND L.E.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

K.E.,
Appellant,
*v.*
K.M.L. AND L.L.L.,
Appellees.

Opinion
No. 20230162-CA
Filed March 14, 2024

Third District Court, West Jordan Department
The Honorable Matthew Bates
No. 222900154

Julie J. Nelson and Alexandra Mareschal,
Attorneys for Appellant

Bradley A. Schmidt, Attorney for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1     In connection with an adoption proceeding brought in district court, the rights of a biological father were terminated. The father now claims on appeal that the district court relied impermissibly on generalized concerns of his minor children's need for permanence and that our recent decision in *In re L.L.B.*, 2023 UT App 66, 532 P.3d 592, compels reversal here. We agree with the father and reverse.

BACKGROUND

¶2 KML[1] (Mother) and KE (Father) have two minor children,[2] who are the subject of this appeal—EE, age sixteen, and LE, age thirteen. For much of the children's lives, Father has been incarcerated. As relevant here, from 2013 to 2018, Father was incarcerated. During that period, his time with EE and LE "consisted of, at most, a weekly visit" with them at the prison.

¶3 In 2018, Father was released from prison on parole. Sometime during this same period, Mother and Father divorced and Mother married LLL (Stepfather). According to Father, after the divorce, the parent-time arrangement allowed him visits every other weekend. But Father saw EE and LE only once in the summer of 2018. Beyond that visit, Father says he "tried to" exercise his parent-time four times, but that each time he went to Mother's home for the exchange as required by the divorce decree, Stepfather told him the decree required Father to text Mother. Father disputes the texting requirement. The final time Father attempted to visit the children, he found that they had moved and the "house was empty." Mother had not given him an updated address or contact information. Father notified the law enforcement officers whom Mother and Father used to communicate with one another.

---

1. Regarding this opinion's omission of periods following initials, see *A.W. v. Marelli*, 2024 UT App 8, ¶ 1 n.1. This practice is consistent with The Chicago Manual of Style, which states that if "an entire name is abbreviated, spaces and periods can usually be omitted." *The Chicago Manual of Style Online* ¶ 10.12 (17th ed. 2017).

2. A third child, JE, was initially a part of these proceedings but has since turned eighteen and is no longer included.

¶4 In January 2020, Father returned to prison because of a parole violation, and he remained there until December of that same year. Following his release, he tried contacting Mother, but when he called the "last phone number [he] had with her[,] . . . there was nothing." He asked his family to help him contact Mother, but they had no way to reach her either. Father returned to prison in November 2021 because of another parole violation. While incarcerated, he tried to call the children but still did not have updated contact information. Father says he also wrote letters for the children but did not send them because he did not have a current address for Mother.

¶5 In April 2022, Mother and Stepfather petitioned the district court for termination of Father's parental rights and Stepfather's adoption of the children. The court bifurcated the proceedings and, following a hearing in November 2022, determined that Father met the statutory ground of abandonment for termination of parental rights.

¶6 In January 2023, during a second evidentiary hearing, the district court determined that it was in the best interest of EE and LE to terminate Father's parental rights. The court determined that the children presently had "no relationship" with Father. Both children testified that they had "no memory of him, and they would not recognize him if they saw him." The court also determined that for the last four years, Stepfather had "assumed the role of natural father" to the children, including socializing with them, playing with them, attending their school and extracurricular activities, assisting with their schoolwork, and caring for them, such as by driving them places and making them meals. Both EE and LE "testified to the strong emotional bond" they had with Stepfather and their desire to be adopted by him, which the court gave some weight in consideration of their ages. The court also determined that the "destruction of the relationship between the children and [Father's] extended family . . . [was] due to [Mother's] failure to respond to efforts" made by the family to

see the children. The court determined that Mother was "not supportive of the relationship between the children and [Father's] family." During the hearing, Father requested reconsideration of the court's abandonment finding. The court took new evidence on the issue but ultimately did not alter its finding and terminated Father's parental rights.

¶7     In February 2023, the district court held a hearing concerning Stepfather's adoption of EE and LE, during which Father asked the court to stay the adoption pending appeal. Following arguments from each party, the district court proceeded with the adoption, determining that it was "in the best interests of the [children] that [the] adoption go forward."

¶8     Father appeals.

ISSUE AND STANDARDS OF REVIEW

¶9     On appeal, Father argues that the district court erred by deciding that termination of Father's parental rights was in the best interest of EE and LE. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "A lower court's best-interest ruling is reviewed deferentially," but we do not limit our review to considering whether any relevant facts have been left out; we also "assess whether the court's determination that the clear and convincing standard had been met goes against the clear weight of the evidence." *In re L.L.B.*, 2023 UT App 66, ¶ 16, 532 P.3d 592 (cleaned up).

ANALYSIS

¶10    "The right of parents to raise their children is one of the most important rights any person enjoys." *In re D.S.*, 2023 UT App 98, ¶ 16, 535 P.3d 843 (cleaned up), *cert. granted*, Jan. 25, 2024 (No.

20230877). Before terminating parental rights, a district court must find that (1) "one or more of the statutory grounds for termination are present" and (2) "termination of the parent's rights is in the best interests of the child." *In re L.L.B.*, 2023 UT App 66, ¶ 17, 532 P.3d 592 (cleaned up). A district court "must make both of these findings . . . by clear and convincing evidence and the burden of proof rests with the petitioner." *Id.* (cleaned up). Father has not challenged the district court's ruling that statutory grounds for termination existed, so we turn to the best-interest analysis.

¶11 Our supreme court recently determined that a "court must start the best interest analysis from the legislatively mandated position that wherever possible, family life should be strengthened and preserved." *In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827 (cleaned up).[3] Relying nearly entirely on *In re L.L.B.*, 2023

---

3. In the same case, our supreme court determined that a court may terminate parental rights only "when it concludes that a different option is in the child's best interest and that termination is *strictly necessary* to facilitate that option." *In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827 (emphasis added). The district court here made the legal determination that the legislature intended a strictly necessary requirement to apply to the Utah Adoption Act (UAA) for district courts. Yet, the court did not make any subsidiary findings or give reasoned analysis as to whether termination was strictly necessary here; instead, it simply noted in the order's conclusion that it was strictly necessary to terminate Father's rights to allow the adoption to proceed. Both parties make arguments on appeal whether the district court erred in this conclusion but neither addresses whether the strictly necessary requirement is even appropriate to apply.

The UAA applies to district courts and reads as follows: "The district court may terminate an individual's parental rights in a child if . . . the individual's parental rights are terminated on grounds described in Title 80, Chapter 4, Termination and

(continued…)

UT App 66, 532 P.3d 592, a recent decision from our court in which we reversed the termination of a father's parental rights, Father argues that the court erred when it determined that termination and adoption was in the best interest of EE and LE. Father does not claim that the court's findings were erroneous; instead, he asserts that the facts taken together do not support the court's ruling. "The best-interest inquiry is intended as a holistic examination of all of the relevant circumstances that might affect a child's situation." *Id.* ¶ 21 (cleaned up); *see also In re D.S.*, 2023 UT App 98, ¶ 18 ("The best-interest inquiry is wide-ranging and asks a court to weigh the entirety of the circumstances of a child's

---

Restoration of Parental Rights, and termination is in the best interests of the child." Utah Code § 78B-6-112(5)(e).

Comparatively, the Termination of Parental Rights Act applies to juvenile courts and reads as follows: "[I]f the juvenile court finds termination of parental rights, from the child's point of view, is *strictly necessary*, the juvenile court may terminate all parental rights with respect to the parent if the juvenile court finds any one of the [listed grounds for termination]." *Id.* § 80-4-301(1) (emphasis added).

The case in which our supreme court stated that the best interest of the child analysis includes the strictly necessary requirement was an appeal from juvenile court. *See In re B.T.B.*, 2020 UT 60, ¶ 1. The supreme court has not yet addressed whether this analysis also applies to appeals from a district court—particularly given the absence of the "strictly necessary" language in the UAA.

Our court recently acknowledged, but did not answer, this same question in *In re L.L.B.* when it determined that it did not need to address the issue because "even without considering the strictly necessary part of the best-interest analysis . . . there [was] not clear and convincing evidence supporting the district court's conclusion that termination of Father's parental rights was in [the child's] best interest." 2023 UT App 66, ¶ 18, 532 P.3d 592. We conclude the same and will not address the issue further.

situation . . . ." (cleaned up)). A district court undertakes this analysis from the child's perspective and must consider the child's "physical, intellectual, social, moral, and educational training and general welfare and happiness." *In re L.L.B.*, 2023 UT App 66, ¶ 21 (cleaned up). To support his argument that the district court erred, Father argues that the "facts and legal analysis are almost identical" between his case and *In re L.L.B.* This is an overstatement of the cases' factual parallels, and we are quick to point out where the two cases diverge; however, we still conclude that *In re L.L.B.* is factually similar enough to be helpful in reaching our ultimate conclusion that the district court did err.

¶12    In *In re L.L.B.*, like the situation in the case before us, the district court terminated the father's rights in order to allow a stepfather to adopt a child. *Id.* ¶ 15. Our court reversed. *Id.* ¶ 35.

¶13    In that case, less than a week after the birth of his child, the father left due to a drug relapse. *Id.* ¶ 2. Over the course of the next year, the father saw the child only twice. *Id.* A paternity agreement then granted the mother sole custody and awarded parent-time to the father. *Id.* ¶ 3. Three years later, the mother married the stepfather, with whom she and the child lived from that point on. *Id.* ¶ 4. For approximately five years, the father used his parent-time, but then the parents got into an argument. *Id.* Around that same time, the father and child were in a four-wheeling accident, which the mother suspected had been caused by the father's alcohol use. *Id.* In the months that followed, the father's parent-time was supervised because the mother was concerned that he was using drugs and alcohol around the child. *Id.*

¶14    About two years later, the mother and stepfather filed a petition in district court for termination of the father's parental rights and the stepfather's adoption of the child. *Id.* ¶ 5. At trial, the mother testified that in the nearly two-year period leading up to the proceedings, the father had attempted to contact the child

only twice. *Id.* ¶ 7. She also testified that he was severely behind on child support payments, and he had never been involved in the child's education. *Id.* The guardian ad litem testified that the child did not have a relationship with the father due to his absence and that, in contrast, the stepfather was "an excellent father" who had a "great bond" with the child. *Id.* ¶ 13 (cleaned up). Over the course of the case, the father relapsed, went to jail, and got sober. *Id.* ¶ 12. At the time of trial, he had a job and was again paying child support. *Id.*

¶15 The mother admitted that since filing the termination petition, she had not responded to the father's requests to see the child. *Id.* ¶ 7. The father's mother testified that she had tried "to stay in contact" with the child but had "difficulty getting responses" from the mother. *Id.* ¶ 9. After the termination petition had been filed, the father had seen the child once and had written letters to the mother, sent a gift, and emailed the child. *Id.* ¶ 11.

¶16 The district court concluded that the child deserved a "healthy, stable family relationship" with the stepfather, who was the child's father figure, and that it was in the child's best interest for the adoption to go forward. *Id.* ¶ 15 (cleaned up). Because the adoption could not occur without termination of the father's parental rights, the district court determined "by clear and convincing evidence that it [was] 'strictly necessary'" to terminate the father's rights. *Id.* Our court reversed because the district court's conclusion that termination was in the child's best interest went "against the clear weight of the evidence." *Id.* ¶ 34. We will discuss some of the applicable reasoning from *In re L.L.B.* in our ensuing analysis.

¶17 Here, the district court based its decision that termination was in the best interest of EE and LE primarily on two categorical concerns. First, the court stated that the children needed permanency by reasoning that it was "in the best interest of the children to have a normal family life and a permanent home and

to have a positive nurturing family relationship with a mother and father." Second, the court reasoned that Father's absence while incarcerated required termination of his rights because "weekly visits at the prison . . . are not an adequate substitute to a father in the home and do little to maintain the bond between parent and child." But categorical concerns such as these are not enough to overcome the legislative presumption that it is in the best interest of children to be raised by their natural parents. We now address why these concerns are insufficient grounds to terminate Father's rights.

## I. Permanency

¶18    "As our supreme court has explained, categorical concerns about the lack of permanence of an option other than adoption are not enough, otherwise termination and adoption would be strictly necessary across the board." *In re L.L.B.*, 2023 UT App 66, ¶ 23, 532 P.3d 592 (cleaned up). Just as in *In re L.L.B.*, while we understand the concern about what Stepfather's legal rights may be regarding the children if Mother dies or Mother and Stepfather divorce,[4] this concern is present in many termination cases, and it does not lead us to the conclusion here "that termination of a parent's rights is in the [children's] best interest." *Id.*

---

4. The legislature might wish to consider that our court frequently sees this issue raised by stepparents who are concerned over what their legal role will be in a child's life if their spouse—the child's natural parent—dies. A statute addresses this concern for grandparents, but no such legal protections exist for stepparents. *See* Utah Code § 30-5-2(4); *see also In re S.T.T.*, 2006 UT 46, ¶ 30, 144 P.3d 1083 (upholding the statute recognizing that the death of one parent creates potential conflict between the surviving parent and the "in-law" grandparents and, accordingly, providing "an avenue for grandparents and grandchildren to maintain their relationship" through visitation rights).

¶19 Relatedly, Father argues that the district court erred because it did not find that "the present quality of the [c]hildren's relationship with Stepfather would be changed by adoption." We agree and see no evidence on the record that—excluding a tragedy like Mother's death—the adoption will change the living situation or custody of the children. The absence of such a change "is a factor that may weigh against termination in some cases." *In re B.T.B.*, 2018 UT App 157, ¶ 56, 436 P.3d 206 (cleaned up), *aff'd*, 2020 UT 60, 472 P.3d 827. Just as in *In re L.L.B.*, we see no findings from the district court that EE and LE's "current living situation [is] not healthy and stable" or that their living situation will change in any way if Stepfather does not adopt them. *See* 2023 UT App 66, ¶ 27. Indeed, we see no evidence, or even an assertion, that Stepfather's love, care, or attachment would change in the absence of an adoption decree.

¶20 Thus, the categorical concern of stability and permanency does not support the court's decision to terminate Father's parental rights.

## II. Incarceration

¶21 Because Father has been in and out of prison for much of the children's lives, the district court relied on the categorical concern of his incarceration to support its termination decision. While it is true that it is much harder for incarcerated parents to be engaged in their children's lives, the legislature's policy that we must begin with an assumption that it is in the best interest of children "to be raised under the care and supervision of [their] natural parents" does not support a categorical rule that incarcerated parents' rights should be terminated. *In re D.S.*, 2023 UT App 98, ¶ 18, 535 P.3d 843 (cleaned up), *cert. granted*, Jan. 25, 2024 (No. 20230877). In *In re D.S.*, our court recently reversed a juvenile court's termination of parental rights in the case of a father who was incarcerated at the time. *Id.* ¶ 33. The father there expressed "a desire to have a stronger relationship" with his

children. *Id.* ¶ 11 (cleaned up). This court determined that "a parent's desire to build and maintain—coupled with efforts to actually maintain—a meaningful relationship with a child is a factor that will often weigh in favor of . . . a determination that it is in the child's best interest to keep the relationship intact." *Id.* ¶ 27. Our court also explained that the father's desire to have visitation with his children upon his release should also be "viewed positively" in the best-interest inquiry. *Id.*

¶22    Here, Father is currently incarcerated and has not, at the present, turned his life around like the father in *In re L.L.B*, 2023 UT App 66, ¶ 30, 532 P.3d 592. However, Father has expressed that he misses the children and has a desire to "support them in their daily lives, their school, [and] their personal affairs." Father said that he is "glad that they are living a decent" life, but he still wants to be a part of that life. We acknowledge and credit Father's desire to build a relationship with the children despite his incarceration. Additionally, from 2013 to 2018, Father interacted with the children in the only avenue available to him as an incarcerated parent—through "at most, a weekly visit" at the prison. And though these visits did not continue during his subsequent periods of incarceration, it was at this point that Father had no means of contacting his children due to Mother's actions.

¶23 Furthermore, there is no evidence that Father's relationship with EE and LE is harmful to them—just as in *In re L.L.B.* where there was no finding that the father's presence "affirmatively harmed" the child or that the father's "attempts to exercise his parental rights" in any way "negatively affected or disrupted" the child's life. 2023 UT App 66, ¶ 24; *see also In re D.S.*, 2023 UT App 98, ¶ 24 (reversing termination of an incarcerated father's parental rights in part because there was "no indication that [the father's] continuing relationship" with the children was "harmful to them, rather than merely perhaps inconvenient"). Here, neither party has raised any concerns about Father ever

posing a threat to or endangering the children. This is important. Even in *In re L.L.B.*, though the father had turned his life around, there were instances in the past of concern for the child's safety, such as the four-wheeling accident and supervised visits over fear of the father's substance abuse. *See* 2023 UT App 66, ¶ 4. We note that in *In re L.L.B* our court emphasized that courts must weigh parental conduct in the past against later conduct and that the father was a "presently fit and capable" parent. *Id.* ¶ 29 (cleaned up). We only point to this concern to emphasize that no such circumstance exists here.

¶24   Thus, not only is the district court's reliance on the fact of Father's incarceration unsupported in this case, but the creation of such a categorical rule goes against Utah's statutes and caselaw.

### III. Other Concerns

¶25   Mother and Stepfather, in an effort to distinguish *In re L.L.B.* from the present case, point to the fact that, unlike Father, the father in that case made "many" attempts to communicate with the children after his incarceration. 2023 UT App 66, ¶ 29, 532 P.3d 592. However, Father's argument is well-taken that the district court determined this lack of communication was "largely the result of Mother and Stepfather's interference." Mother moved the children without telling Father or providing any means of contacting them. This lack of communication should not be held wholly against Father as it was the result of Mother's actions; to do so would certainly encourage other parents to prevent communication in an effort to similarly strengthen their cases for termination of parental rights.

¶26   Relatedly, any lack of relationship—or as the court put it "destruction" of the relationship—between the children and Father's extended family was due to Mother's lack of support and her "failure to respond to [the extended family's] efforts . . . to see the children." Mother's failure to respond to these efforts should likewise not be held against Father.

¶27 Thus, looking holistically at the evidence presented, as courts are required to do, *see id.* ¶ 21, we conclude that the evidence does not clearly and convincingly demonstrate that termination of Father's parental rights was in EE's and LE's best interest. In our view, the primary bases for the district court's decision were its categorical conclusions about the need for permanency and the insubstantial nature of a parent/child relationship when a parent is incarcerated. We view Utah precedent as precluding reliance on such categorical concerns. And we view the remainder of the district court's findings to be insufficient to meet the required burden of proof once these bases are removed from the analysis. Given our legislature's clear expression that, "as a matter of state policy, the default position is that it is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents," *id.* ¶ 31 (cleaned up), we must reverse.

¶28 The court's order in the adoption decree relied on the termination of all Father's "rights, duties and responsibilities, including residual parental rights." Accordingly, with our reversal of the termination order, we also reverse the adoption decree. While this decision is final, it does not preclude the possibility of future termination and adoption proceedings if there is a material change in circumstances.

CONCLUSION

¶29 The district court's conclusion that the termination of Father's parental rights was in the best interest of EE and LE was against the clear weight of the evidence. As a consequence of this error, the court also erred when it granted Stepfather's adoption of the children in reliance on termination of Father's rights. We therefore reverse.

———————