**2024 UT App 62**

# THE UTAH COURT OF APPEALS

IN THE MATTER OF THE ADOPTION OF P.P.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

B.P.,
Appellant,
*v.*
B.M. AND J.M.,
Appellees.

Opinion
No. 20230486-CA
Filed May 2, 2024

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 222900323

Sheleigh Harding, Attorney for Appellant

Sierra D. Hansen, Attorney for Appellees

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

OLIVER, Judge:

¶1    B.P. (Father) appeals from a district court order terminating his parental rights to his daughter, Phoebe.[1] Father's only claim on appeal is that his counsel (Counsel) provided ineffective assistance for failing to call certain witnesses to testify at trial. But because Father's claim hinges on his request for a remand to develop the record, and because we deny the request, we affirm the district court's order.

---

1. We employ a pseudonym for the child.

BACKGROUND

¶2     In 2014, two weeks after Phoebe was born, Father was arrested on a parole violation, and he remained incarcerated on various charges for "a big portion of her life." Phoebe lived with her mother (Mother) until the summer of 2021, when Mother became seriously ill and was hospitalized with rapidly declining health. Two weeks before Mother's eventual death, Father was released from prison.

¶3     Phoebe spent the day before Mother's death with Father. But, on Mother's wishes, B.M., Phoebe's maternal grandmother (Grandmother), and Grandmother's husband, J.M. (Step-Grandfather; collectively, Grandparents), retrieved her from Father.[2] The next day was an "extremely traumatic day," as it became clear that Mother was dying. Father appeared at the hospital demanding to take Phoebe with him. His behavior was "intense," "erratic," and "scary" enough that security removed him from the hospital. That night, at a vigil in Mother's honor, Grandmother refused to let Phoebe leave with Father, so he called the police to assist him. But the police declined to physically place Phoebe with Father.

¶4     Phoebe then went to live with Grandparents. Grandmother initiated guardianship proceedings and Father filed an objection. The case was referred to mediation, which was unsuccessful because Father failed to appear. The court found that Father's failure to appear "amount[ed] to a default" and granted Grandmother permanent guardianship. The court noted Father's parental rights had not been severed and recommended he seek

---

2. There is some dispute about how much time Phoebe spent with Father before Mother died. Father testified it was "four or five days," but according to Grandparents, she spent just one day with him.

services and parent-time, but because he was eventually incarcerated again, Father did not do so.

¶5 In August 2022, Grandparents petitioned to adopt Phoebe. The district court held a one-day bench trial. At trial, Step-Grandfather testified that Phoebe was "scared" of Father because of his behavior and had expressed fear that Father would try to take her. Step-Grandfather testified that Phoebe felt abandoned by Father, as he had never written her letters, called her on her birthday, or sent her gifts. Step-Grandfather stated he had a "very minimal" relationship with Father and believed "it wouldn't be a safe environment" for Phoebe to live with him. Mother's friend (Friend), who had been at the hospital on the day of Mother's death, testified about Father's "scary" and "intense" behavior in trying to take Phoebe with him against Mother's wishes. Grandmother testified that Father called Phoebe only one time since Mother's death and had not followed the court's guardianship order to establish a relationship with her. Grandmother stated that she could not work well with Father because she did not have a relationship with him.

¶6 Although Father's initial disclosures included a list of ten potential witnesses, Counsel called only one witness at trial—Father himself. Father testified that he had regular communication with Mother while Mother was still alive and he would talk to Phoebe whenever he could, but he admitted that these phone calls mostly consisted of his talking to Mother. He admitted he had been incarcerated for a "big portion" of Phoebe's life and had not attended the guardianship proceedings, but he noted that Phoebe had spent "four or five days" with him before Mother died. And he testified that he had tried to contact Phoebe after Mother's death, but Grandparents had given him a "bogus number" and he could not "get ahold of them." He stated that Grandparents had a "vendetta" against him.

¶7     The court then issued its findings of fact and conclusions of law. First, the court found clear and convincing evidence of statutory grounds for termination, concluding Father had both abandoned Phoebe and made only token efforts to support or communicate with her. With respect to abandonment, the court found prima facie evidence that Father had no communication with Phoebe since shortly after Mother's death, he had defaulted in the guardianship proceeding, and Grandparents were not aware of his location until they saw a news report that he had been arrested. And with respect to token efforts, the court found Father had, in fact, made no effort to support Phoebe "financially or emotionally"; he was incarcerated for "substantial periods" of her life and had made no attempt to communicate with her while incarcerated; and though he had "some communication with [Phoebe] while out of jail, these time periods were short." The court also found that Father had "never provided a home" for Phoebe and had never lived with her.

¶8     The court then turned to what it called the "crux of this case"—whether termination was in Phoebe's best interest. The court found the presumption of preserving "natural familial bonds" had been rebutted in this case because Father had never lived with Phoebe, did not fulfill "the normal parental obligations/responsibilities," and "never had a positive, nurturing parent-child relationship" with her. The court also considered whether a permanent guardianship could equally protect and benefit Phoebe, but it found that Father and Grandparents "have a terrible relationship" and "will never be able to work together to ensure [Phoebe] has a healthy relationship" with both parties. And though Phoebe had some interaction with Father's extended family, the court found this was "not substantial enough to outweigh the harms" to Phoebe resulting from a lack of permanence in her guardianship arrangement. The court also found that Father was unable to act in Phoebe's best interest, demonstrated by his calling the police to remove Phoebe from

Mother's vigil, which was "highly traumatic" for Phoebe. The court found it likely that, should the guardianship remain intact, Phoebe would have to endure the fear of recurring traumatic events. Thus, the court found it strictly necessary from Phoebe's point of view to terminate Father's parental rights.

¶9 Father immediately filed a notice of appeal from the termination order. In the meantime, the court granted Grandparents' petition for adoption. Father then filed a notice of appeal from the adoption decree. On the parties' stipulation, this court then consolidated the two appeals. After his appeals were consolidated, Father filed a motion requesting a stay of briefing, alleging Counsel provided ineffective assistance and requesting a remand to the district court to develop the record in support of his claim. Father noted that because this was a civil case, remand under rule 23B of the Utah Rules of Appellate Procedure was not available but urged that remand could nonetheless be granted under one of several other "procedural pathways."

¶10 In support of his request for remand, Father attached declarations from six potential witnesses—his mother, sister, grandmother, uncle, aunt, and wife. Each declaration offered a variation on the same basic facts: Father's extended family members were "heavily involved" with Phoebe's and Mother's lives, Father and Phoebe had "weekly" phone contact, Father and Phoebe "lived" together with Father's mother and sister before Mother's death, Father was a "regular dad" and had established a "loving and affectionate . . . father/daughter relationship" with Phoebe, and Grandparents were "difficult to contact" or had "completely blocked" Father's extended family from contacting Phoebe after Mother's death. Father argued this testimony would have changed the outcome of his trial—rendering Counsel's failure to call the witnesses ineffective assistance. We denied the stay and deferred ruling on Father's request for remand "pending briefing and plenary consideration of the appeal."

ISSUE AND STANDARD OF REVIEW

¶11    Father's only argument on appeal is that Counsel provided ineffective assistance by failing to call several witnesses during the termination proceeding. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *In re C.M.R.*, 2020 UT App 114, ¶ 11, 473 P.3d 184 (cleaned up).

ANALYSIS

¶12    Father argues Counsel provided ineffective assistance in failing to call several witnesses at the termination trial. To prevail on his claim, Father "must demonstrate both (1) that [Counsel's] performance was deficient and (2) that [he] suffered prejudice as a result." *In re D.R.*, 2022 UT App 124, ¶ 16, 521 P.3d 545 (cleaned up), *cert. denied*, 525 P.3d 1264 (Utah 2023). But because the record does not support his claim, Father requests a remand for the district court to hold an evidentiary hearing regarding Counsel's alleged ineffective assistance.

¶13    Father recognizes that remand here is not possible under rule 23B of the Utah Rules of Appellate Procedure. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a *criminal case* may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." (emphasis added)). But he urges we may nonetheless grant a remand patterned after two of our prior decisions, *In re S.H.*, 2007 UT App 8, 155 P.3d 109, and *In re C.M.R.*, 2020 UT App 114, 473 P.3d 184. In both cases we determined that—in the context of child welfare proceedings in juvenile court—parents who provided extra-record evidence alleging ineffective assistance on appeal were entitled to a remand similar to that provided by rule 23B to develop the record in support of their claims. *See In re C.M.R.*, 2020 UT App 114, ¶¶ 31–

32; *In re S.H.*, 2007 UT App 8, ¶¶ 14–16. As this type of remand is "analogous to remand under rule 23B of the Utah Rules of Appellate Procedure, it requires a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *In re D.R.*, 2022 UT App 124, ¶ 18 (cleaned up).

¶14 This procedure has not yet been applied in the context of private termination petitions filed in district court.[3] But we decline Father's invitation to do so here because even were we to grant him such a remand, he would be unable to show that Counsel was ineffective. In order to terminate Father's parental rights, the district court was required to find that (1) one or more of the statutory grounds for termination were present and (2) termination was in Phoebe's best interest. *See In re adoption of J.E.*, 2024 UT App 34, ¶ 10. The court made detailed findings on each step and, even accepting the facts asserted in the carefully worded witness declarations as true, they do not undermine these findings.

¶15 Several of the declarations asserted that Father had weekly phone contact with Phoebe before Mother's death. But this does not contradict the court's finding that Father's last contact with Phoebe was shortly after Mother's death and nearly two years prior to the trial. Several of the declarations stated that Phoebe

---

3. Given the concern that the "rule 23B-like remand" procedure created in *In re S.H.*, 2007 UT App 8, 155 P.3d 109, may conflict with the Utah Rules of Appellate Procedure, *see In re C.M.R.*, 2020 UT App 114, ¶¶ 36–37, 473 P.3d 184 (Harris, J., concurring), and because it has been applied only in the child welfare context in juvenile court, we urge the Supreme Court's Advisory Committee on the Rules of Appellate Procedure to consider lending formality to the procedure and to provide for its application to district court private termination proceedings as well as to juvenile court termination proceedings.

had "lived" with Father before Mother's death. But Father himself testified he had only spent "four or five days" with Phoebe during that time. And, regardless, this testimony would not have altered the court's finding that Father had "never provided a home for [Phoebe], much less a permanent home, and has never lived with" her.

¶16    All six witness declarations suggested that Father was a "regular dad," had a "loving and affectionate . . . father/daughter relationship" with Phoebe, and was attentive to her needs. But the court determined that there was strong evidence that Father "lacks the ability to act in [Phoebe's] best interest" because, after never having custody of her, "he called the police to physically remove her from" the vigil on the day of Mother's death, which was "highly traumatic" for her. Further, the court found that Father knowingly allowed guardianship to be granted to Grandparents and had never followed the court's orders to develop a relationship with Phoebe pursuant to the guardianship order. Testimony about positive interactions between Phoebe and Father—observable for at most five days—does not dispel the court's finding that Father had "never had a positive, nurturing parent-child relationship" with her.

¶17    Several of the potential witnesses stated that Grandparents had "abducted" Phoebe from Father. And several alleged that Grandparents had either been difficult to reach or had "completely blocked" them from contacting Phoebe. But the court found that Phoebe had interacted with Father's extended family under the guardianship order, though this contact was "not substantial enough to outweigh the harms to" Phoebe from a lack of permanency. And, if anything, these apparent conflicts between Grandparents and Father's family only seem to add support to the court's finding that Grandparents and Father had a "terrible relationship" and would be unable to work together to facilitate a healthy relationship between all parties.

¶18   We fail to see how this testimony from Father's family members would have changed the court's conclusion that statutory grounds for termination existed and that termination was in Phoebe's best interest. Thus, even were we to grant a remand to Father, he would be unable to show that Counsel's failure to call these witnesses prejudiced him. And without a showing of prejudice, his ineffective assistance claim would fail. *See In re D.R.*, 2022 UT App 124, ¶ 16 (noting a parent must show "*both* (1) that counsel's performance was deficient and (2) that [the parent] suffered prejudice as a result" (emphasis added) (cleaned up)). Accordingly, we deny Father's request for remand. *Cf. State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3d 1166 (stating that, in the rule 23B context, "[i]t stands to reason that if the defendant could not meet the test for ineffective assistance of counsel, even if his new factual allegations were true, there is no reason to remand the case, and we should deny the motion").

## CONCLUSION

¶19   Father's appeal presented one issue: whether Counsel provided ineffective assistance. Because this argument is contingent on Father's request for a remand, and because we deny this request, we affirm the district court's order in all respects.

———————